434 So.2d 149 (1983)
Michael J. SAMANIE
v.
Sidney BOURG, et al.
Nos. 82-CA-148, 82-CA-147, 82-CA-149 and 82-CA-150.
Court of Appeal of Louisiana, Fifth Circuit.
March 8, 1983.
Writ Denied May 23, 1983.
*150 Samanie & Barnes, Herbert W. Barnes, Houma, for Michael J. Samanie, plaintiff-appellee.
A. Deutsche O'Neal, Jr., Houma, for A. Deutsche O'Neal, Sr., plaintiff-appellee.
Boggs, Loehn & Rodrigue, Thomas E. Loehn, New Orleans, for St. Paul Fire & Marine Ins. Co., defendant-appellant.
Before CHEHARDY, BOWES and DUFRESNE, JJ.
CHEHARDY, Judge.
These cases were consolidated for trial in the district court and for argument here. They result from an automobile accident involving two automobiles which occurred at the intersection of U.S. Highway 90 and Louisiana Highway 52 in Boutte, Louisiana, on December 11, 1977. Sidney Bourg, an uninsured motorist, accompanied by Chyrel Bourg, his guest passenger, was travelling on Highway 90 in an easterly direction away from New Orleans. He made a left turn at the intersection, where his vehicle was struck by an automobile driven by Michael J. Samanie, accompanied by his guest passenger, A. Deutsche O'Neal, Sr.
Suit No. 19,461 of the docket of the 29th Judicial District Court for the Parish of St. Charles (No. 82-CA-147 of our docket) was instituted by the Bourgs against the State of Louisiana, Department of Transportation *151 and Development (Office of Highways).[1] This suit was dismissed when these plaintiffs failed to appear at the original date set for trial and is not before us here.
Suit No. 19,749 of the district court (No. 82-CA-148 of our docket) was filed by Samanie against Sidney Bourg, the Louisiana Department of Transportation and Development, and St. Paul Fire & Marine Insurance Company, Samanie's own insurer, under the uninsured motorists provision of his policy. St. Paul filed a third party demand against Bourg and the Highway Department.
Suit No. 19,719, 434 So.2d 157 (La.App. 1983) was filed by St. Paul Fire & Marine in the district court against Bourg and the Highway Department.
Suit No. 19,748 of the district court, 434 So.2d 158 (La.App.1983) was instituted by A. Deutsche O'Neal, Sr., against Sidney Bourg, the Department of Transportation and Development, and St. Paul Fire & Marine Insurance Company.
Following trial, judgment was rendered in favor of Samanie in the sum of $62,500[2] and in favor of O'Neal in the sum of $40,913.51.[3] Cast in judgment was Sidney Bourg and St. Paul Fire & Marine Insurance Company. All other claims and counterclaims were dismissed.
St. Paul Fire & Marine Insurance Company has appealed.
The record establishes the following facts:
Highway 90 is a major thoroughfare through South Louisiana. At the intersection in suit it consists of three lanes for traffic proceeding toward New Orleans, one is a left-turn lane, and the other two lanes are for vehicles travelling directly toward the city. Each lane is controlled by a semaphore light. There are three lanes for traffic proceeding away from the city, one lane is a right-turn lane. On the date of the accident two of those lanes were controlled by semaphore lights, but the right-turn lane was not.[4]
Bourg testified he was travelling on Highway 90 coming from New Orleans. At the intersection of Highway 52 he was in the far left-hand lane and intended to turn left. He stopped at the intersection for a red light. There was traffic on the other side of the highway going toward New Orleans that was also stopped for the light. One car was to his right. Nothing blocked his vision and there were no obstructions which would have prevented him from seeing either side of Highway 90. He looked down Highway 90 to a bend in the road about one-quarter mile away, and saw nothing prior to making the turn. About 15 seconds after turning, his car was struck by the Samanie vehicle in the middle of the intersection. He never saw the other car before the impact.
Samanie's version of the accident, supported by his guest passenger, O'Neal, is that he was travelling toward New Orleans at a speed of about 35 miles per hour approaching the intersection with caution because he knew it to be a dangerous one. He had actually taken his foot off the accelerator, slowed down and had his foot on the brake. The light was green for vehicles proceeding toward New Orleans. Just as he entered the intersection Bourg pulled into his path. Although he immediately put on the brake, it was too late to avoid the accident. An independent witness, Barbara *152 Pellegrin, confirmed that the light was green for Samanie when he crossed the intersection.
The trial court did not believe Bourg's version of the accident. It found Samanie free of negligence and Bourg grossly negligent by turning into traffic at a time when he should have seen that it was unsafe to do so. The record amply supports this conclusion. The trial court further found no negligence on the part of the state.
In this court appellant contends: (1) the Department of Highways is likewise liable for improper design, construction and maintenance of this intersection; (2) the quantum is excessive; and (3) it is entitled to indemnity from Bourg.
Appellant bases its first contention on the testimony of the investigating State Police Officer John Cornwall. Cornwall testified he was familiar with the intersection. He stated there were three lights for eastbound traffic (two red or green and one left-turn signal for traffic turning off Highway 90 onto Highway 52), but there was no left-turn lane for westbound traffic or a left-turn signal for the westbound lanes of Highway 90; therefore the traffic semaphore for automobiles turning toward Houma would be the same color as the traffic lights for cars travelling toward New Orleans.
He was of the opinion that there were obscurements present at the time of and immediately prior to the accident in that vehicles in the turn lane would obscure the vision of traffic proceeding in the direction of the Samanie vehicle as well as traffic proceeding in the direction and path of the Bourg vehicle.
The trial court was unimpressed with this testimony. The court concluded he was not present at the time of the accident and therefore was incompetent to testify as to conditions and obscurements which might have been present at the time of, or shortly after, the accident.
The defective design of which appellant complains is that traffic travelling east on Highway 90 would enter into a left-hand turn lane and have to come to a stop, while the remainder of eastbound traffic and traffic on Highway 90 westbound could proceed straight ahead. On the other hand, Highway 90 westbound traffic could turn left, but without benefit of a reciprocal left-turn lane or light control. It claims Bourg was lulled into a false sense of security because when his light was green and when he saw vehicles coming from the opposite direction stop, he assumed the traffic lights were set up to permit him to make his left-hand turn under a protective green light, while eastbound traffic was stopped for a red light.
Since Bourg's testimony was that his vision was unobstructed for one-fourth mile before he made his turn, and he made no claim of having been lulled into a false sense of security, and since the state trooper was not present at the time of the accident, the insurer failed to convince the trial court that there was any negligence on the part of the state. We also note there was no evidence submitted at the trial to show that the intersection was defectively designed or negligently maintained. If Bourg had looked and prudently executed his left turn the accident would not have occurred. Accordingly, we find no negligence on the part of the state.
Relative to appellant's second contention, we turn our attention to the award of $62,500 to Michael J. Samanie.
The force of the impact drove Samanie under the steering wheel and dashboard causing him to strike his knees. He experienced extreme and immediate pain in his legs. He was taken to the emergency room of a local hospital. At that time Samanie complained of contusions and bruises, neck pain and left knee pain. His neck and back pain persisted for a few weeks, but the left knee pain continued and on July 25, 1978 he consulted Dr. Dexter Gary, an orthopedic specialist. He later injured his back when his knee gave way and he fell on a stairway.
Dr. Gary testified he found evidence of contusion on the anterior lateral aspect of the left knee. The range of motion of that *153 knee was within normal limits. The medial collateral ligament was stable, but there was anterior cruciate laxity on the left side. Plaintiff's right leg was smaller, and the motion was less in that leg because of previous surgery. That surgery was as a result of a previous skiing accident in 1976 when plaintiff injured both knees.
The doctor reviewed x rays taken at the hospital after the injury in this suit. No fractures were identified but an orthogram of the left knee was recommended because of the anterior laxity, and the doctor concluded that the left knee was unstable. This was performed on February 1, 1978 and indicated a separation of the meniscal ligament function on the medial side consistent with the diagnosis of medial collateral strain and probable medial meniscus tear sustained during the skiing accident. On the lateral side of the left leg there was a horizontal tear in the meniscus.
The doctor concluded from evaluating the orthogram that the lateral meniscus injury was caused by the accident in suit because that diagnosis had not been alluded to, nor had plaintiff been treated for any lateral problems in 1977, or subsequent to that time after he had been essentially discharged from injuries relative to the skiing accident.
On November 6, 1978, plaintiff returned with continued problems of instability in the left knee. In testing for stability in the anterior direction he was unstable, but the collateral ligament on the medial side was stable. The initial finding of anterior lateral contusion was supported by physical evidence which was still visible some 30 days after the accident.
Based on the history, clinical examination and the test performed on Samanie, it was Dr. Gary's conclusion that the lateral meniscus problem was related to the accident in suit, and it is highly probable that this accident aggravated the prior medial meniscus problem. It is consistent with this type of injury that the patient would have periods of remission and exasperation.
In February 1982 a knee brace was prescribed as was physical therapy in the form of exercises. Plaintiff was familiar with those exercises because he had performed them during rehabilitation of his right knee after the skiing accident.
It is more probable than not that in the future Samanie will have to have surgery for repair of the cruciating ligament and a menisectomy. The cost would range from $1,500 to $2,000 including repair of the medial meniscus if it had to be taken out. Hospital costs would run about $2,500, and future physical therapy is a possibility.
Depending on the surgery performed and whether or not the menisci removed would be medial, lateral, or both, the physical impairment might range from 5% to 25%. This may restrict movement in the joint. Plaintiff has a 25-degree restriction in his right leg due to the skiing accident, and Dr. Gary expected the restriction in motion in the left leg would not be any less.
Dr. Michael Flynn, a chiropractor, testified he first treated Samanie for a fall at his home or apartment where he fell on the stairway and hit the left side of his rib cage on a railing. He does not recall plaintiff indicating his knee gave out. Plaintiff had extreme chronic back pain and at times siatic pain down the legs. He was seen August 24, 1979. Examination revealed vertebra out of normal alignment in the thoracic spine, which would indicate nerve pressure and neuritis. Treatment was manipulation. X rays were taken and problems were noted in the thoracic spine and to a lesser extent, the lumbar spine; L-5 in particular was diagnosed as a thin disc syndrome. This is one of the most common causes of back pain. Plaintiff's problems were diagnosed as inflammation of a nerve in the thoracic spine and the thin disc syndrome. The doctor stated manipulation relieves the pressure in that it moves the vertebra away from the nerve.
Between August 1979 and January 1981 Samanie was seen on 34 occasions. Treatment consisted of spinal manipulation, deep heat, traction, and diathermy to the lower back or in the mid-thoracic area, and recently to the knee.
*154 Dr. Flynn could not say whether the thin disc syndrome was attributable to the accident when plaintiff's knee gave way, but stated trauma could aggravate the disc syndrome. Since plaintiff never complained of thoracic problems prior to August 1979 Flynn concluded the trauma of hitting the stairway precipitated the thoracic condition.
Appellant contends Samanie's award is excessive for the following reasons: (1) other than emergency treatment he sought no further medical attention until six weeks after the accident; (2) his present condition could be related to the prior skiing accident; (3) he saw Dr. Gary on only three occasions with medical expenses of less than $100; and (4) the only other testimony in support of plaintiff's claim is that of a chiropractor.
1. We find no merit in appellant's first complaint. Had Samanie's knee problems cleared, as did his neck and back injuries, there would have been no necessity to seek further medical attention. Since the knee problem did not improve after the six-week period, plaintiff properly sought further medical attention at that time.
2. The medical evidence clearly indicates that the orthopedic specialist was well aware of plaintiff's prior skiing accident, his injuries in connection therewith and the surgery performed at that time. He was questioned at length about the possibility of plaintiff's present problem resulting from that accident and he answered in detail, as we have discussed, in his testimony. His testimony refutes the fact that the instability in plaintiff's left knee which has now manifested itself is a result of the prior accident. He attributed this to the fact that the left knee had been asymptomatic since plaintiff was discharged from the skiing accident, and Samanie had not had to seek further medical attention for his left knee until after the accident in suit.
While the doctor would have preferred that plaintiff not continue to ski, we note that plaintiff has gone skiing no more than two weeks each year and that he confines this activity to two or three hours per day as opposed to nine hours prior to the accident. We also note that plaintiff is unable to play tennis or racquet ball, which he used to enjoy.
3. Nor are we impressed with appellant's complaints that plaintiff saw Dr. Gary on only a few occasions. Plaintiff was familiar with the exercises necessary to stabilize his left leg, because he had used them in rehabilitating his right leg, and being aware of the results of a 25-degree disability in the right leg following prior surgery, we cannot fault him for delaying future surgery on the left leg as long as possible.
Furthermore, it is axiomatic that the amount of medical treatment received does not necessarily reflect the severity or the seriousness of the injury. Wilson v. Dixie Auto Insurance Company, 345 So.2d 994 (La.App.2d Cir.1977). It appears that plaintiff (an attorney) did not see fit to overtreat or overmedicate himself in order to build up an award he would receive from the defendant. See Goldberg v. Stauffer Eshleman Co., Ltd., 384 So.2d 531 (La.App. 4th Cir.1980).
4. We cannot determine from the record the weight the trial court gave to the chiropractor's testimony, but even without his testimony it is uncontradicted that plaintiff's injuries are of a serious nature resulting in instability of the left knee requiring future surgery and an expected degree of permanent disability. The chiropractor's testimony simply clarified treatment to plaintiff's back as a result of the fall on the staircase, which plaintiff attributed to his unstable knee.
Relative to O'Neal's injuries, he was 72 years old at the time of the accident and had only a left arm. He was thrown into the dashboard and his head struck the windshield with such force it broke the glass and his hearing aid was shattered. He was dazed and briefly lost consciousness. He was taken to the emergency room of a local hospital with complaints of injuries to the head, left ear, neck, left shoulder, arm, back and knees. Extensive x rays were made and O'Neal was instructed to see his family doctor.
*155 Samanie and O'Neal are both attorneys and they were on their way to New Orleans to try a case in federal court scheduled the following day. O'Neal was concerned about his head injury and had the hotel phone him every hour throughout the night. The trial lasted three days during which time his head hurt, his neck was sore, his back ached, his movements were greatly restricted and he had pain in the knees, left shoulder and arm.
Upon returning to his home in Houma, O'Neal consulted Dr. Ray Cinnater whom he had been seeing for some time for arthritis. Relative to complaints stemming from this accident, Dr. Cinnater told plaintiff to rest and take aspirin. When he did not improve, plaintiff consulted Dr. Christopher Senac, an orthopedic specialist. Dr. Senac recommended consultation with Dr. Earl Hackett, a neurologist, and suggested physical therapy. O'Neal later consulted a chiropractor.
In support of his claim O'Neal introduced the depositions of Dr. Christopher Cenac, the orthopedic specialist, Dr. Earl Hackett, the neurologist, and Dr. John Flynn, the chiropractor.
Dr. Christopher Cenac's deposition disclosed he first saw O'Neal on June 16, 1978. The doctor found no abnormal orthopedic findings, but concluded this plaintiff would have residual disabilities as a result of the accident because of his age and degenerative osteoarthritis present in the cervical and lumbar spine and extremeties, as disclosed by the x rays. Plaintiff's symptoms should be relieved with mild analgesic and would continue for about one year after the accident.
It was not suggested that plaintiff limit his activities, because he performed no manual labor, led a sedentary life, and his age and prior loss of the upper right extremity in itself would severely limit any physical activities. Plaintiff's injuries were diagnosed as cervical and lumbosacral sprain, contusion to both knees, the upper left extremity and the shoulder.
On June 30 plaintiff's elbow was injected with a steriod preparation. This was repeated on November 14, 1978 and March 23, 1979. The doctor could not state with medical certainty that problems of the elbow were related to the accident, but he did conclude the other injuries above described resulted from the accident.
Dr. Earl Hackett, a neurologist, saw O'Neal on August 24, 1978 at Dr. Cenac's request. The history taken disclosed complaints following the accident of injuries to the head, ear, back and neck, and beginning in January 1978, an aching pain fluctuating in intensity in the arm, originating in the elbow and going to the wrist. In certain positions the left arm felt weak and caused plaintiff to drop things. He also complained of headaches and problems with walking since April 1978.
Examination revealed a good range of motion in the neck with pain when bent laterally to the right and tender muscles in the occipital region of the back. In the doctor's opinion plaintiff had a cervical degenerative disease possibly based on age but accentuated by the trauma, which could probably be permanent in nature. The doctor concluded plaintiff's fear of losing the use of his left arm played a considerable part in the perpetuation of his symptoms, because he had already lost part of his right arm.
From a neurological standpoint there were no objective findings but the doctor felt plaintiff could have a legitimate loss of sensation on a psychological basis. Physical therapy was recommended for the arm and neck.
Dr. John Flynn, the chiropractor, saw plaintiff on April 25, 1979. Plaintiff complained of problems with his neck, back, left arm and hand, forearm, shoulder and chronic low back pain. X rays revealed osteoarthritis. Plaintiff was seen on seven other occasions until July 19, 1979. On each visit the doctor adjusted the cervical, thoracic and lumbar spine. Plaintiff seemed to respond to treatment. The doctor was unable to say with certainty that the problems in 1979 were referable to the accident, but stated that it was not uncommon for patients with a considerable whiplash to develop *156 problems at a later date due to trauma, and that there was a possibility that the complaints may be related to this accident because the x rays taken in 1979 indicated a lot of osteoarthritis and degenerative process which is not the norm for anyone 73 years old or otherwise. Flynn concluded the arthritic condition preceded the accident but that the accident may or may not have aggravated it.
Appellant contends O'Neal's award is excessive because (1) he did not seek medical attention until 6 months after the accident; (2) he failed to call one of his physicians, thus giving rise to the legal presumption that his testimony would be adverse; and (3) complaints relative to plaintiff's back, neck and arms are not referable to this accident.
We do not agree with appellant's first contention. Plaintiff sought medical attention immediately after the accident and did discuss his problems three or four days later with another doctor who had been treating him for several years for arthritis.
It is plaintiff's failure to call this doctor to testify that appellant complains of in its second contention. O'Neal's explanation is that the doctor recommended aspirin and bed rest. When this failed to relieve his complaints plaintiff saw medical specialists. Apparently the trial court accepted this explanation, or felt there was sufficient medical evidence in the record to overcome the presumption.
Nor do we agree with appellant's third contention that medical evidence fails to support the fact that plaintiff's back and neck pain were unrelated to the accident. They are likewise disturbed because they aver any injuries to plaintiff's arm are unrelated to the accident because plaintiff had no complaints of injury in this area until 16 months after the accident, and there is no medical evidence that supports a finding that the arm injury is accident-related.
It is clear from plaintiff's own testimony that he was very frightened and concerned about any injury to his arm or hand because he only has one. This appears to us to be abundently clear, as it no doubt did to the trial court, that such fear would be wholly legitimate, even without expert testimony. In spite of the fact that the doctor found no neurological problem in the arm, the doctor was well aware of plaintiff's fear and the fact that it played a considerable part in the perpetuation of plaintiff's symptoms.
The trial judge summarized O'Neal's injuries as fright, fear or mental anguish, soft tissue injury to the neck, injury or aggravation of a cervical disc condition, cervical strain, activation of arthritic condition of the cervical spine, and contusion of the head, arm and shoulder, and awarded O'Neal $48,500.
In arriving at a determination of whether or not the awards to Samanie and O'Neal are excessive we are guided by our Supreme Court in the long line of jurisprudence which has stemmed from the leading cases of Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Canter v. Koehring Company, 283 So.2d 716 (La.1973); Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976); and Reck v. Stevens, 373 So.2d 498 (La.1979).
Civil Code Article 1934(3) provides that in the assessment of general damages much discretion must be left to the trier of fact.
As stated in Gaspard v. LeMaire, supra, 158 So.2d at page 158:
"The primary question before the appellate court, then, is whether the judge or the jury in fixing the amount of the award has abused this great discretion vested in them by law. * * *"
In Coco v. Winston Industries, Inc., supra, the court stated at page 335:
"* * * [B]efore a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. * * * Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, * * *." (Emphasis ours.)
See also Reck v. Stevens, supra.
We have carefully reviewed the record including the lay testimony and all of the medical evidence, and the long line of cases *157 cited by plaintiffs and appellant and those relied on by the trial court, and we are unable to say that the record clearly reveals that the trier of fact abused his much discretion in making its award. Thus we affirm the awards to both plaintiffs.
We do, however, agree with appellant's final contention. The judgment rendered against appellant St. Paul Fire & Marine Insurance Company results from its being the uninsured motorist carrier of plaintiff Samanie. It is called upon to respond in judgment to Samanie and O'Neal due to the negligence of the uninsured motorist Sidney Bourg. Consequently we find it is entitled to judgment on its third party demand against third party defendant Sidney Bourg. R.S. 22:1406(D)(4). We will amend the judgment accordingly.[5]
For the reasons assigned the judgment appealed from is amended as follows:
It is ordered, adjudged and decreed that there be judgment on the third party demand in favor of third party plaintiff St. Paul Fire & Marine Insurance Company and against third party defendant Sidney Bourg for the extent of such payments to be made by it as provided by this judgment, to Michael J. Samanie in the sum of $62,500 and to A. Deutsche O'Neal, Sr., in the sum of $40,913.51 with legal interest from date of judicial demand until paid.
In all other respects the judgment appealed from is affirmed.
AMENDED AND AFFIRMED.
NOTES
[1] By supplemental and amended petition Allstate Insurance Company was named a defendant as the uninsured motorist carrier of Chyrel Bourg, a member of the household of Carolyn Tanner. Chyrel Bourg settled her claim with Allstate and that defendant was dismissed from the suit.
[2] $59,500, later amended to $62,500 to conform to itemized damages listed in the reasons for judgment.
[3] Both plaintiffs were awarded unspecified medical expenses subject to a credit for expenses paid, and Samanie was awarded the cost of repairs to the damaged vehicle, subject to a credit for that already paid.
[4] The configuration of the intersection has been changed since the date of the accident.
[5] Although the question was not raised by the litigants we are aware of the controversy which exists between the circuits as to whether or not interest on uninsured motorist judgments run from date of judicial demand or from date of judgment. Sua sponte we requested briefs from the parties on this issue.

After careful consideration we have concluded the trial court was correct in awarding interest from date of judicial demand. We rely on the Supreme Court case of Hoefly v. Government Employees Ins. Co., 418 So.2d 575 (La. 1982). In that case the court held that the law imposes an obligation in solido on the part of the tort-feasor and the uninsured motorist carrier, both being obligated to the same thing, repair the damage to the victim. See also Chaisson v. Whitney, 427 So.2d 470, No. 5-221 of our docket handed down January 10, 1983 and not yet reported; Hebert v. Ordoyne, 388 So.2d 407 (La.App. 1st Cir.1980); Powell v. Allstate Insurance Company, 233 So.2d 38 (La. App. 2d Cir. 1970); But cf. Horstmann v. Drake, 420 So.2d 473 (La.App. 4th Cir.1982); and Guidroz v. Tauzin, 413 So.2d 682 (La.App. 3d Cir. 1982).